UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**MEMORANDUM & ORDER**

ROSIE ROSSITO-CANTY, DIANA
SEPULVEDA, MATTHEW J. MARI,
ERIK PISTEK, LAWRENCE GILDER,
DAVID PASCARELLA, MICHAEL
REILLY, and for all similarly situated
voters of the Eleventh Congressional
District in the State of New York,

15-CV-0568

                    Plaintiffs,

        – against –

ANDREW M. CUOMO, in his official
capacity as Governor of the State of New
York,

                    Defendant.

**Parties**

Rosie Rossito-Canty,
Diana Sepulveda,
Matthew J. Mari,
Erik Pistek,
Lawrence Gilder,
Michael Reilly,
and for all similarly situated voters
of the Eleventh Congressional
District in the State of New York

Andrew M. Cuomo,
in his official capacity as Governor
of the State of New York

**Appearances**

Ronald Castorina, Jr.
The Law Offices of Ronald
Castorina, Jr.
1336 Clove Road
Staten Island, NY 10301
(718) 701-3100
roncastorina@gmail.com

John M. Schwartz
Eva Lenore Dietz
Office of the Attorney
General of the State of
New York
120 Broadway
New York, NY 10271
(212) 416-8559
john.schwartz@ag.ny.gov
eva.dietz@ag.ny.gov

JACK B. WEINSTEIN, Senior United States District Judge

**Table of Contents**

I.    Introduction .................................................................................................... 4
II.   Losses from an Unfilled Seat in House of Representatives ........................... 5
   A. Categories of Critical Losses .................................................................... 6
       1. Denial of Participation in Policymaking ............................................. 6
       2. Loss of Ombudsperson ......................................................................... 7
       3. Adverse Effect on National Debates .................................................... 8
III.  Facts .............................................................................................................. 9
   A. Resignation of Representative Grimm ...................................................... 9
   B. Loss of Voting Representation .................................................................. 9
   C. Governor's Response ............................................................................... 10
   D. Instant Lawsuit ........................................................................................ 10
   E. Status of Upcoming Special Election Intended to Fill the Vacant House Seat .... 11
   F. Map of Eleventh Congressional District .................................................. 12
IV.   The Historical Basis of the Right to Representation ................................... 12
   A. Declaration of Independence .................................................................. 12
   B. United States Constitution ....................................................................... 13
       1. Original Draft .................................................................................... 13
       2. Reconstruction Amendments .............................................................. 14
          a. Fourteenth Amendment ................................................................. 14
          b. Fifteenth Amendment .................................................................... 15
   C. Treatment of the Reconstruction Amendments by the Courts ............... 15
   D. Modern Constitutional Expansion of the Right to Vote ......................... 17
   E. Recent Supreme Court Cases Affirm the Right to Vote and the Right to
      Representation ......................................................................................... 18
   F. Authority of United States District Court ............................................... 19
V.    The Delicate Relationship Between the Federal Judiciary and Other Branches of
      Government ............................................................................................... 19
   A. "Properly Limited" Role of the Federal Court ........................................ 19
   B. Proper Instances of Court Interference in Democratic Process ............. 20
VI.   Right of Constituents in Congressional Districts to Have Vacant Congressional
      Seats Filled ............................................................................................... 21
   A. Table of State Laws Calling on Special Elections When Elected Offices Left
      Vacant ...................................................................................................... 21
   B. Pertinent Case Law ................................................................................. 26
       1. *Valenti v. Rockefeller* (U.S. 1969) .................................................. 26
       2. *Jackson v. Ogilvie* (7th Cir. 1970) ................................................. 27
       3. *Rodriguez v. Popular Democratic Party* (U.S. 1982) ...................... 27
       4. *Mason v. Casey* (E.D. Pa. 1991) ..................................................... 28
       5. *American Civil Liberties Union v. Taft* (6th Cir. 2004) .................. 29
       6. *Judge v. Quinn* (7th Cir. 2010) ....................................................... 29
       7. *Fox v. Paterson* (W.D.N.Y. 2010) ................................................... 30

VII.  Statutory Analysis ....................................................................................... 31
  A.  The United States Constitution .............................................................. 31
  B.  New York State Constitution ................................................................. 32
  C.  New York State Public Officers Law Section 42(3) .............................. 33
    1.  New York Court of Appeals Insists on Speedy Elections ................. 33
    2.  The Statutory Seventy to Eighty Days Allows Ample Time to Prepare for a
      Special Election .............................................................................. 34
VIII.  Instant Case ............................................................................................... 35
  A.  Standing ................................................................................................ 35
    1.  Law ................................................................................................. 35
    2.  Application of Law to Facts ............................................................. 35
  B.  Ripeness ............................................................................................... 36
    1.  Law ................................................................................................. 36
    2.  Application of Law to Facts ............................................................. 36
  C.  Injunctive Relief .................................................................................. 37
    1.  Preliminary Injunction .................................................................... 37
      a.  Law ........................................................................................... 37
        i.  Irreparable Harm ................................................................. 38
        ii.  Clear or Substantial Likelihood of Success on the Merits ..... 38
        iii.  Balance of Hardships .......................................................... 38
        iv.  Public Interest .................................................................... 39
      b.  Application of Preliminary Injunction Law to Facts ................... 39
    2.  Permanent Injunction ...................................................................... 40
      a.  Law ........................................................................................... 40
      b.  Application of Permanent Injunction Law to Facts .................... 41
IX.  Additional Claims ...................................................................................... 41
X.  Conclusion ................................................................................................. 42

## I.    Introduction

On January 5, 2015, the seat in the United States House of Representatives for New York's Eleventh Congressional District became vacant.  The district includes all of Staten Island and parts of southern Brooklyn.  It is sixty-six square miles in size and has a population of some seven hundred and twenty-five thousand.  *See generally* New York's Eleventh Congressional District, Ballotpedia, http://ballotpedia.org/New_York%27s_11th_Congressional_District; *infra* Part III.F.

The power and responsibility to set the date for a special election to fill the vacancy is that of the Governor of the State of New York.  Even though the vacancy has now continued for forty-two days, the Governor has not exercised that power or fulfilled that responsibility.

Under New York law, the special election must be held between seventy and eighty days from the date of the Governor's announcement setting the date.  Were the Governor to act today, the election would be held, at the earliest, one hundred and twelve days after the vacancy occurred.  During that period, residents of the Eleventh Congressional District would remain unrepresented in the House of Representatives.

At a preliminary hearing on a petition by voters from the district to compel the Governor to make an immediate decision, the Governor's counsel, in response to questions from the court, did not provide a date.  His justification for the failure to designate a time for the special election was:  "[T]he governor's office is actively working on this considering all the factors."  Hr'g Tr. 33:20–21, Feb 13, 2015.  His position was that the Governor has discretion to delay the special election until the next general election in November of this year.

The right to representation in government is the central pillar of democracy in this country.  Unjustified delay in filling a vacancy cannot be countenanced.

4

Unless the Governor announces the date for a special election on or before noon on Friday, February 20, 2015, or justifies a further delay at a hearing to be conducted by this court at that time and date, this court will fix the date for a special election as promptly as the law will allow.

Exercising that power of a federal judge under Article III of the United States Constitution would cause this court great regret in view of its respect for the sovereign State of New York and its government.  Prompt action by the Governor would permit maintaining the normal relationship of comity between federal and state officials.

## II.   Losses from an Unfilled Seat in House of Representatives

The Constitution presumes that, "absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process."  *FCC v. Bench Commc'ns, Inc.*, 508 U.S. 307, 314 (1993) (internal quotation marks and citation omitted).  Voters maintain control and the ballot box is a means to approve or disapprove policies of elected officials.  *See, e.g.*, *Bond v. Atkinson*, 728 F.3d 690, 694 (7th Cir. 2013) ("How domestic-relations matters compare with the many other subjects clamoring for law-enforcement attention is for the people to decide through elections and appointments.").

"'No right is more precious in a free country than that of having a voice in the election of those who make the laws.'"  *Clingman v. Beaver*, 544 U.S. 581, 599 (2005) (O'Connor, J., concurring) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)).  *Cf. Weiss v. Feigenbaum*, 558 F.Supp. 265, 276 (E.D.N.Y. 1982) ("The right to vote remains, at bottom, a federally protected right." (quoting *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978))).  The federal protections of the right to vote also include those against interference from the states.  A primary concern of the Framers was that the states would compromise the national electoral process:

> If the State legislatures were to be invested with an exclusive power of regulating these elections, every period of making them would be a delicate crisis in the national situation, which might issue in a dissolution of the Union, if the leaders of a few of the most important States should have entered into a previous conspiracy to prevent an election.

Alexander Hamilton, *Federalist No. 59* (1788).

This concern was balanced against the recognition that the states' involvement ensured a truly representative national body: "Whilst a few representatives, therefore, from each State, may bring with them a due knowledge of their own State, every representative will have much information to acquire concerning all the other States."  Publius, *Federalist No. 56* (1788).

### A.  Categories of Critical Losses

There are three categories of critical losses when a seat in our nation's legislature body is unfilled:  *first*, the loss to persons and institutions in the district who forfeit their power to help decide both the nation's policies at large, and those national decisions that impact the particular needs and views of the district; *second*, the loss to those in the district of a vital, powerful, individual channel to and from the government's bureaucracy and its benefits—the Congressperson and his or her staff acting as an ombudsperson for those in the district; and, *third*, the loss to the nation as a whole which gives up the input from a unique group of people represented by an individual with the opportunity to contribute meaningfully to national debates and policy and whose views should be available to temper those of colleagues.

### 1.  Denial of Participation in Policymaking

The first category—participation in national policymaking and committee legislative decisions that impact one's life—is critical in our large, heterogeneous society.  For example, during the current debate on the proposal for an extended war against terrorism in which young men and women of the district will risk death, the district's residents need to be heard through

their representative in the House of Representatives.  *See, e.g.*, Obama Asks Congress to Back Fight Against Islamic State, But is Vague on Limits, L.A. Times, Feb. 11, 2015, http://www.latimes.com (last visited Feb. 16, 2015).  To those who seek a Representative's recommendation to one of the nation's military academies, a delay in the election process beyond the spring may cut off a career.

There is a fundamental and inalienable right of representation under our system of government—a right that denied was a large factor in starting our revolution of 1776.  *See infra* Part IV.  A brooding sense of estrangement from our government pervades much of our nation. To cut off representation in the House of Representatives will increase the sense of disaffection and alienation that can seriously weaken the fabric of society.

### 2.  Loss of Ombudsperson

The second category—the ombudsperson, the door to access our national bureaucracy, the individual's friend and guide in the complex channels of national government—is a critical aspect of the work of each member of the House of Representatives.  *Cf.* Walter Gellhorn, *Ombudsmen and Others: Citizens' Protectors in Nine Countries* (1967); *The Compact Oxford Dictionary* 1209:784 (2d ed. 2002) ("Ombudsperson: an official appointed to investigate complaints by individuals against maladministration by public authorities").  A citizen abroad turns to his or her Congressperson for help with the State Department in obtaining the nation's protections.  At home, frustrated by the lack of an appropriate response with respect to a welfare payment, aid to small business in sending its products abroad, tax collections, or other matters, the resident turns for help to the Representative from the district and his or her staff in local and Washington, D.C. offices.

That aspect of the national legislator's work was little understood when our nation was

founded.  It is now critical in the successful operation of the government.  Without assistance to citizens in threading their way through the labyrinth of our nation's bureaucracy, the dissatisfaction of the electorate would threaten the viability of our huge, modern democracy.  *See, e.g.*, Morris P. Fiorina, *The Case of the Vanishing Marginals: The Bureaucracy Did It*, 71 Am. Pol. Sci. Rev. 177, 179–80 (1977) ("Members of the U.S. Congress . . . hold an almost unique position vis-à-vis the bureaucracy:  [C]ongress[people] possess the power to expedite bureaucratic activity.  This capability flows directly from congressional control over what bureaucrats value most—higher budgets and new program authorizations.  In a very real sense congress[people] are monopoly suppliers of bureaucratic 'unsticking' services. . . .  The congress[person] is a source of succor.").

### 3.  Adverse Effect on National Debates

The third category of loss—lack of input into national debates from all elements of our society—increases the risk of unsound national public policy and legislation.  Given the diverse nature of the needs and views of the many segments of our sociologically, economically and geographically divided nation, representation from separate districts is essential.

It was foundational in the Madisonian view that the new government be a republic with a representational legislature, so necessary in a country as diverse and large as ours.  *See, e.g.*, Richard Labunski, *James Madison and the Struggle for the Bill of Rights* 87 (2006) ("[Madison] argued . . . at the [Virginia ratifying] convention and most convincingly in *Federalist 10*, that a geographically large nation could be governed as a republic and not a monarchy, and that the liberty of the people would be preserved in a government if freely chosen by them.").  *See generally* Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (1996).

The Eleventh District of New York is unique.  It is a mixed suburban-urban area, sometimes represented by Republicans, located in the City of New York, which is overwhelmingly represented by Democrats.  It has a special voice which should not be silenced on critical issues of taxes, welfare payments, social security, health benefits, war and peace and the myriad of protections and controls of our federal government.

## III.  Facts

### A.  Resignation of Representative Grimm

On January 2, 2015, Congressman Michael Gerard Grimm of the Eleventh Congressional District of New York tendered his resignation, effective January 5, 2015.  Compl. ¶¶ 14–15, ECF No. 1 ("Compl.").  In his resignation letter, he wrote:

> It has been an honor and a privilege to serve the hardworking families of Staten Island and Brooklyn, and I am sincerely grateful for the love and support that I have received from so many . . . .  I have seen first-hand how extraordinary the people of this District are—their values, their love of community, and their care for each other in the best and worst of times—it is humbling.

Agata Decl. Ex. A, ECF No. 9 ("Agata Decl.").

### B.  Loss of Voting Representation

The Clerk of the House of Representatives has since taken over the Washington, D.C. office and the district offices of the former representative of the Eleventh Congressional District of New York.  Current Vacancies, Office of the Clerk, U.S. House of Representatives, http://clerk.house.gov/member_info/vacancies_pr.aspx?pr=district&vid=91 (last visited February 16, 2015).  Announcing the "limited scope of the vacant congressional office," the Clerk clarified:  "[T]he congressional district does not [currently] have voting representation."  *Id.* Without a Representative in charge, these officers are neutered.  *See supra* Part II.  Residents of the Eleventh Congressional District are seriously deprived.  In some instances, their well-being

9

may be endangered by lack of an elected Representative.  *Id.*

### C.  Governor's Response

On January 9, 2015, the Governor's office received Representative Grimm's letter of resignation.  Agata Decl. ¶ 2.  Promptly, legal counsel to the Governor reviewed relevant federal and state law provisions regarding such vacancies.  *Id.* at ¶ 3.  They determined that, while the Governor was required to issue a writ or proclamation of a special election to fill the vacancy, the timing at which he chose to do so was "discretionary."  *Id.*

One month later, on February 2, the Governor told a reporter who asked about timing of an upcoming special election that his office was "looking at it now."  Pl. Aff. Reply 3, ECF No. 12.  When pressed on the timeframe of the special election, he said:  "We don't have one."  *Id.*

### D.  Instant Lawsuit

On February 5, eight plaintiffs, six Staten Islanders and two Brooklyn residents, all voters in the Eleventh Congressional District, commenced this action.  Compl. ¶¶ 4–12.  Suing Andrew M. Cuomo, the Governor of New York, they requested the issuance of an injunction directing him to forthwith call a special election to fill the vacant congressional seat left by Grimm.  *Id.* at ¶¶ 38, 44, 47, 51.

The following day, on February 6, the court issued an order, directing defendant to:

> [S]how cause before this Court on . . . Friday, February 13, 2015 . . . why an order should not be issued commanding Defendant ANDREW M. CUOMO, in his official capacity as Governor of the State of New York, to issue a Proclamation of Election, forthwith, for the Eleventh Congressional District in the State of New York, wherein a date for said election is fixed not less than 70 nor more than 80 days from the issuance of said Proclamation, as provided by *Article 1, § 2, Clause 4 of the United States Constitution*, and *New York Public Officers Law § 42(3)*, and for such other and further relief as the Court deems just, proper, and equitable.

Order to Show Cause, Feb. 6, 2015, ECF No. 6.

10

One week later, on February 12, the Governor's office informed the court that it "intends to comply with the law with respect to proclaiming a special election for the Congressional seat vacated by Representative Grimm," but that "in determining the timing of such a proclamation, there are many important, and in some cases competing logistical and other practical factors that must be considered."  Agata Decl. ¶ 4.  The declaration noted that the office "has been actively considering these factors in order to determine an appropriate date on which to proclaim a special election for this Congressional seat."  *Id.*

On February 13, the order to show cause hearing was conducted.  Hr'g Tr., Feb. 13, 2015.  Defense counsel contended that the Governor would ultimately issue a proclamation for a special election; they denied that this court could decide timing.  *Id.* at 21:21–22:2.  Plaintiffs argued that they were suffering irreparable harm when residents' opportunities to be heard on important federal issues before the House of Representatives such as authorization of the Keystone XL pipeline, and President Obama's recent announcement that, with consent of Congress, he plans to prosecute a war against the Islamic State of Iraq and Levant.  *Id.* at 19:6– 13.

### E.  Status of Upcoming Special Election Intended to Fill the Vacant House Seat

To date, the Governor has not issued a writ or proclamation calling for a special election to fill the vacant house seat in the Eleventh Congressional District. *See infra* (map depicting the prominence of the Eleventh Congressional District).

**F.  Map of Eleventh Congressional District**



U.S. Census, http://www2.census.gov/geo/maps (last visited Feb. 16, 2015).

**IV.    The Historical Basis of the Right to Representation**

**A.  Declaration of Independence**

The right of citizens to elect their representatives in government is fundamental.

In the pre-Revolutionary era, writs of election were issued by the British monarchy to call elections.  The withholding of this writ, and thus the denial of representation, was one of the main complaints of the colonists.  Zachary D. Clopton & Steven E. Art, *The Meaning of the Seventeenth Amendment and A Century of State Defiance*, 107 Nw. U. L. Rev. 1181, 1202–04

12

(2013).  In the *Declaration of Independence*, Thomas Jefferson called this practice one of King

George III's cardinal sins and declared that it justified rebellion:

> He has dissolved representative houses repeatedly, for opposing with manly firmness his invasions on the rights of the people.
>
> *He has refused for a long time*, after such dissolutions, *to cause others to be elected*; whereby the legislative powers, incapable of annihilation, have returned to the people at large for their exercise; the state remaining in the mean time exposed to all the dangers of invasion from without, and convulsions within.

*Declaration of Independence* ¶¶ 6,7 (U.S. 1776) (emphasis added).

## B.  United States Constitution

### 1.  Original Draft

The original United States Constitution chiefly addressed the process governing how

representatives were elected.  Little in the text suggested that the right to voting and

representation were fundamental.  *See generally* U.S. Const.; Burt Neuborne, *Madison's Music:*

*On Reading the First Amendment* 42–43 (2015).

The primary provisions that concern the electoral process are as follows:

- Art. I, § 2 cl. 1:  The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

- Art I, § 2 cl. 4:  When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.

- Art I, § 4 cl. 1:  The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Place of Chusing Senators.

13

- Art I, § 5 cl. 1: Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and a Majority of each shall constitute a Quorum to do Business . . . .

The Elections Clause in Article I, section 2 of the Constitution, obliges state legislatures to promulgate regulations for congressional elections, including elections to fill vacancies. *See* U.S. Const. art. 1, § 2 cl. 4. This power and obligation is limited only by Congress's authority to make or alter election regulations. *See id.* at art. 1, § 4 cl. 1. Through the writ of election, the state executive calls the election to fill the vacancy and sets its time, place, and manner, subject to procedural parameters set by state law. *See* Alexander Hamilton, *Federalist No. 59* (1788).

It was only with the introduction of the Reconstruction Amendments following the Civil War that the right to vote itself, and by extension the right to representation, became an unambiguous constitutional right.

### 2. Reconstruction Amendments

#### a. Fourteenth Amendment

The Fourteenth Amendment, ratified in 1868, represented the first mention of a right to vote. After slavery was abolished, Congress was concerned that the former slaves would be denied their right to participate in civil society. It passed the Fourteenth Amendment, which mandates strict penalties to the states if this right is violated:

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. *But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the*

14

> *whole number of male citizens twenty-one years of age in such State*.

U.S. Const. amend. XIV, § 2 (emphasis added).

### b.  Fifteenth Amendment

Concerned that the Fourteenth Amendment did not clearly explicate how it protected the franchise of former slaves, Congress passed the Fifteenth Amendment, ratified in 1870.  U.S. Const. amend. XV § 1.  This amendment made the right of former slaves to vote unequivocal:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

*Id.*

### C.  Treatment of the Reconstruction Amendments by the Courts

In the years following the introduction of the Reconstruction Amendments, courts initially narrowed the scope with respect to voting.  In *United States v. Reese*, the Supreme Court held that the Fifteenth Amendment does not guarantee a right to vote; it merely protects against discrimination when exercising that right.  92 U.S. 214 (1875).  Chief Justice Waite wrote:

> *The Fifteenth Amendment does not confer the right of suffrage upon any one.* It prevents the States, or the United States, however, from giving preference, in this particular, to one citizen of the United States over another on account of race, color, or previous condition of servitude. Before its adoption, this could be done. It was as much within the power of a State to exclude citizens of the United States from voting on account of race, &c., as it was on account of age, property, or education. Now it is not. If citizens of one race having certain qualifications are permitted by law to vote, those of another having the same qualifications must be. Previous to this amendment, there was no constitutional guaranty against this discrimination: now there is. It follows that the amendment has invested the citizens of the United States with a new constitutional right which is within the protecting power of Congress. That right is exemption from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude. This, under the express provisions of the second section

of the amendment, Congress may enforce by "appropriate legislation."

*Id.* at 217–18 (emphasis added).

This decision was in line with jurisprudence of the time, which gave states broad powers when it came to defining how citizens exercised their voting rights. *See, e.g.*, *Minor v. Happersett*, 88 U.S. 162, 178 (1874) (holding that women do not have the right to vote as citizens of the United States because the "Constitution . . . does not confer a right of suffrage upon any one, and the constitution and laws of the several States which commit that important trust to men alone are not necessarily void"). This loophole led to states imposing poll taxes and literacy tests, along with the infamous "grandfather clause" as means to restrict the vote while not running afoul of the Fourteenth and Fifteenth Amendments.

These restrictions remained in large part through the pre-World War II era. The Supreme Court rarely intervened to protect voting rights. *See, e.g.*, *Giles v. Harris*, 189 U.S. 475, 487–88 (1903) (holding that the Court could not issue an injunction placing an African-American man on the voter registration rolls regardless of the constitutionality of the state's electoral system); *Breedlove v. Suttles*, 302 U.S. 227, 283–84 (1937) (holding poll taxes constitutional under the Fourteenth and Fifteenth Amendments); *Colegrove v. Green* 328 U.S. 549, 556 (1946) (finding issues of district apportionment to be a non-justiciable political question); *Lassiter v. Northampton County Board of Elections*, 360 U.S. 45, 53–54 (1959) (ruling literacy tests for voting to be facially permissible under the Fourteenth and Fifteenth Amendments). *But c.f. Ex parte Yarbrough* ("The Ku-Klux Cases"), 110 U.S. 651, 665–67 (1884) (holding that the Fourteenth and Fifteenth Amendments give Congress the power to enact legislation protecting the exercise of the right to vote); *Guinn v. U.S.*, 238 U.S. 347, 365

16

(1915) (deeming "grandfather clauses" to be impermissible under the Fifteenth Amendment);

*Nixon v. Herndon*, 273 U.S. 536, 540–41 (1927) (finding unconstitutional under Fourteenth

Amendment state statute barring participation of African-American voters in primary elections);

*United States v. Classic*, 313 U.S. 299, 314–16 (1941) (holding that Constitution confers a right

for citizens to choose their representative, cast their ballots, and have them counted).

### D.  Modern Constitutional Expansion of the Right to Vote

In the twentieth century, a number of amendments to the Constitution radically expanded

the right to vote and increased protections against the denial of that right:

- Amendment XIX, effective 1920, provided women with the right to vote.

- Amendment XXIV, effective 1964, provided that failure to pay a poll or other tax could not be the reason for denying the right to vote.

- Amendment XXVI, effective 1971, guaranteed those eighteen years of age or older the right to vote.

Beginning in the 1960s, the Supreme Court began seriously to enforce the right to vote

and the right to representation.  *See, e.g.*, *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (African-

American voters had claim that city districting scheme violated Fourteenth and Fifteenth

Amendments); *Gray v. Sanders*, 372 U.S. 368, 379–81 (1962) (primary voting system which

gave more weight to rural votes than urban ones unconstitutional under Fourteenth Amendment,

guaranteeing "one person one vote"); *Baker v. Carr*, 369 U.S. 186 (1962) (state statute effecting

an apportionment that deprived plaintiffs of equal protection violated Fourteenth Amendment);

*Reynolds v. Sims*, 377 U.S. 533 (1964) (legislative apportionment scheme giving more weight to

rural districts unconstitutional); *State of South Carolina v. Katzenbach*, 383 U.S. 301, 327–328

(1966) (Voting Rights Act of 1965 constitutional exercise of Congress' power under the

Fifteenth Amendment); *Katzenbach v. Morgan*, 384 U.S. 641, 658 (1966) (banning literacy tests

for voting constitutional); *Harman v. Forssenius*, 380 U.S. 528 (1965) (state scheme whereby voters had to either pay a poll tax or file a certificate of residency in order to be eligible to vote in federal elections deemed unconstitutional); *Harper v. Virginia State Bd. of Elecs.*, 383 U.S. 663, 683 (1966) (holding poll taxes in state elections unconstitutional under Fourteenth Amendment).  *See generally Selma* (Paramount Pictures 2014); Taylor Branch, *Parting the Waters: America in the King Years 1954–63* (1998); *The Autobiography of Martin Luther King, Jr.* (Clayborne Carson ed., 2001).

"As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system." *Reynolds*, 377 U.S. at 562.

### E. Recent Supreme Court Cases Affirm the Right to Vote and the Right to Representation

More recent decisions by the Supreme Court have affirmed the right to vote and the right to representation, even while relaxing some of the strictures of the Voting Rights Act.  *See, e.g.*, *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612, 2619, 2631 (2013) (noting the validity of the Voting Rights Act while holding unconstitutional an aspect of the federal oversight provision); *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 197–98, 211 (2009) (explaining the importance of the right to vote while allowing a municipal utility district to apply for an opt-out of the federal oversight provision of the Voting Rights Act); *Bartlett v. Strickland*, 556 U.S. 1, 25–26 (2009) (holding that the Voting Rights Act requires minorities to make up more than fifty percent of a voting district in order for there to be a mandated "majority-minority" district); *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 441–42

18

(2006) (ruling redistricting plan that fractured a minority opportunity district violated Voting

Rights Act).

### F.  Authority of United States District Court

The obligations of this court under the Constitution are clear:  Where a citizens' right to

vote and/or to be represented—or both—are being impermissibly violated, it is the obligation of

the United States District Court to act upon proper application of an aggrieved party.  "When a

State exercises power wholly within the domain of state interest, it is insulated from federal

judicial review.  *But such insulation is not carried over when state power is used as an*

*instrument for circumventing a federally protected right*."  *Gomillion*, 364 U.S. at 347 (emphasis

added).

### V.  The Delicate Relationship Between the Federal Judiciary and Other Branches of Government

### A.  "Properly Limited" Role of the Federal Court

In line with the *Federalist Papers*, the role of federal courts in our democratic society is

"properly limited."  *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2667 (2013).  "The architects of

our constitutional form of government . . .  assure[d] that courts exercising the 'judicial power of

the United States' would not trench upon the authority committed to the other branches of

government."  *Orr v. Orr*, 440 U.S. 268, 290 (1979).  *See also Nat'l Mut. Ins. Co. of Dist. of Col.*

*v. Tidewater Transfer Co.*, 337 U.S. 582, 591 (1949) (same).

Where an election is fair, the proper role of a federal court is to accept an election's

outcome, s*ee Oden v. Brittain*, 396 U.S.1210, 1211 (1969), not to engage in litigating issues

resolved by voters.  The court's power does not extend to "amorphous, general supervision of the

operations of government."  *Richardson*, 418 U.S. at 192 (Powell, J., concurring).  Eschewing

such a role has "permitted the peaceful coexistence of the countermajoritarian implications of

19

judicial review and the democratic principles upon which our Federal Government in the final analysis rests." *Id.  See also United States v. Butler*, 297 U.S. 1, 79 (Stone, J. dissenting) ("The only check upon our own exercise of power is our own sense of self-restraint.").

Public policy supports the exercise of restraint by federal courts when faced with cases involving the democratic process.  "We should be ever mindful of the contradictions that would arise if a democracy were to permit general oversight of the elected branches of government by a nonrepresentative, and in large measure insulated, judicial branch." *Richardson*, 418 U.S. at 188 (Powell, J. concurring).  "[B]ecause of [our] insulation from majoritarian pressure and the resultant threat to the workings of the democratic process, [we have] been expressly confined to the exercise of the traditional judicial function of case adjudication."  Martin H. Redish, *Federal Judicial Independence: Constitutional and Political Perspectives*, 46 Mercer L. Rev. 697, 707–08 (1995).

### B.  Proper Instances of Court Interference in Democratic Process

"[T]he courts have a role" where "a group has . . . not [been] allowed to play the game," *i.e.*, to engage in the democratic process.  David A. Strauss, *Is Carolene Products Obsolete?*, 2010 U. Ill. L. Rev. 1251, 1257–58 (2010).  Then, "the self-correcting properties of democratic politics will be nullified, and only the courts can make the democratic process work as it should." *Id.  See, e.g.*, *Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan*., 347 U.S. 483, 493 (1954) (noting that education is "perhaps the most important function of state and local governments" but declaring school segregation unconstitutional), *supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955); *Loving v. Virginia*, 388 U.S. 1, 7 (1967) (highlighting that "marriage is a social relation subject to the *State's* police power" but holding Virginia's anti-interracial marriage statutes unconstitutional (emphasis added));  *Avery v. Midland Cnty., Tex.,*

390 U.S. 474, 476 (1968) (emphasizing that although the "forms and functions of local government and the relationships among the various units are matters of state concern . . . a State's political subdivisions must comply with the Fourteenth Amendment"); *Romer v. Evans*, 517 U.S. 620, 623 (1996) (finding that Colorado voter's amendment prohibiting "all legislative, executive or judicial action at any level of state or local government designed to protect" gay, lesbian or bisexual persons unconstitutional); *Strawser, et al. v. Strange*, No. 14-424 (S.D. Ala. Feb. 12, 2015), ECF No. 55 (ruling Alabama law banning same-sex marriage unconstitutional and granting preliminary injunction compelling probate judge to issue marriage licenses to same sex couples).

## VI. Right of Constituents in Congressional Districts to Have Vacant Congressional Seats Filled

On its own motion, the court conducted a fifty-state survey to determine the type of discretion, if any, states provided to state officials regarding the calling of special elections when faced with a vacant congressional seat in the House of Representatives.  The table below demonstrates that, while there is no uniformity among the states with respect to the time for a special election, in general, the time to call a special election is specified and short.

### A. Table of State Laws Calling on Special Elections When Elected Offices Left Vacant

| State | Statute | When Proclamation Issues After Vacancy | Special Election Timeframe | No Writ/Special Election required if vacancy occurs . . . |
|-------|---------|----------------------------------------|----------------------------|-----------------------------------------------------------|
| **Alabama** | Ala. Code §§ 17-5-1, 17-5-2, 17-5-3 | not specified | not specified | undetermined |
| **Alaska** | Alaska Stat. § 15.40.142 | 60–90 days | 60–90 days after vacancy | 60 days before general election |

| **Arizona** | Ariz. Rev. Stat. § 16-222 B | 3 days | 130–150 days after vacancy | 180 days or less prior to general election |
|---|---|---|---|---|
| **Arkansas** | Ark. Code Ann. § 7-8-104 | not specified | not specified | undetermined |
| **California** | Cal. Elec. Code §§ 10700, 10703 | 14 days | 126–180 days after vacancy | after close of nomination period in final term |
| **Colorado** | Colo. Rev. Stat. § 1-12-202 | not specified | not specified | 90 days prior to general election |
| **Connecticut** | Conn. Gen. Stat. § 9-212 | 10 days | at least 60 days after proclamation | 63 days prior to general election |
| **Delaware** | Del. Code Ann. Elec. §§ 7302, 7303 | minimum 60 days before day chosen for special election | any day up to day of general election | undetermined |
| **Florida** | Fla. Stat. § 100.111 | not specified | not specified | undetermined |
| **Georgia** | Ga. Code Ann. § 21-2-543 | 10 days | at least 30 days after proclamation | undetermined |
| **Hawaii** | Haw. Rev. Stat. § 17-2 | not specified | at least 60 days after proclamation | undetermined |
| **Idaho** | N/A | not specified | not specified | undetermined |
| **Illinois** | 10 Ill. Comp. Stat. 5/25-7 | 5 days | at least 115 days after proclamation | less than 180 days before next general election |
| **Indiana** | Ind. Code §§ 3-10-8-1, 3-13-3-2 | not specified | not specified | 74 days prior to general election |
| **Iowa** | Iowa Code § 69.14 | 5 days | at least 40 days after proclamation | undetermined |

| Kansas | Kan. Stat. Ann. §§ 25-3501, 25-3502, 25-3503 | 5 days | 45–60 days after proclamation | 30–90 days before primary or general election<br><br>Vacancy occurs less than 30 days before primary |
|---|---|---|---|---|
| Kentucky | Ky. Rev. Stat. Ann. § 118.720 | not specified | not specified | undetermined |
| Louisiana | La. Rev. Stat. Ann. § 18:1279 | not specified | not specified | undetermined |
| Maine | Me. Rev. Stat. 21-A § 392 | not specified | "as soon as reasonably possible" if Congress is in session, otherwise before the session | undetermined |
| Maryland | Md. Code Ann., Elec. Law § 8-710 | 10 days | at least 72 days after proclamation | at least 60 days before regular/primary election |
| Massachusetts | Mass. Gen. Laws ch. 54, § 140 | "immediately" | 145–160 days after vacancy | after February 1 of even numbered year |
| Michigan | Mich. Comp. Laws §§ 168.145, 168.633 | not specified | not specified | at least 30 days before general election |
| Minnesota | Minn. Stat. § 204D.29 | 3 days if vacancy occurs at least 189 days before state primary | if 155–188 days before state primary, then day of state primary; otherwise not specified | 154 days or fewer before election day |
| Mississippi | Miss. Code Ann. § 23-15-853 | 60 days | 60 days after proclamation | undetermined |

| Missouri | Mo. Rev. Stat. § 115.125 | not specified | approx. 70 days after proclamation | undetermined |
|----------|--------------------------|---------------|-------------------------------------|--------------|
| Montana | Mont. Code Ann. § 13-25-203 | "immediately" | 85-100 days after vacancy | 150 days or less before primary, or between the primary and general elections |
| Nebraska | Neb. Rev. St. § 32-564 | not specified | 90 days after vacancy | on or after August 1 of an even numbered year and prior to the general election |
| Nevada | Nev. Rev. Stat. § 304.230 | 7 days | 180 days after proclamation | undetermined |
| New Hampshire | N.H. Rev. Stat. Ann. §§ 661:6, 661:11 | "as soon as practicable" | not specified | undetermined |
| New Jersey | N.J. Stat. Ann. § 19:3-27 | not specified | not specified | within 180 days of expiration of term |
| New Mexico | N. M. Stat. Ann.§ 1-15-18.1 | 10 days | 84-91 days after vacancy | after primary election and before general election |
| New York | *See infra* Part VII | *See infra* Part VII | *See infra* Part VII | *See infra* Part VII |
| North Carolina | N.C. Gen. Stat. § 163-13 | not specified | not specified | undetermined |
| North Dakota | N/A | not specified | not specified | undetermined |
| Ohio | Ohio Rev. Code Ann. §§ 3501.03, 3521.03 | not specified | 10 days or more after proclamation | undetermined |
| Oklahoma | Okl. Stat. tit 26 § 12-101 | 30 days | not specified | in an even numbered year if the term expires the following year |
| Oregon | Or. Rev. Stat. § 188.120 | not specified | not specified | undetermined |
| Pennsylvania | 25 Pa. Cons. Stat. § 2777 | 10 days | 60 days or more after proclamation | undetermined |

| | | | | |
|---|---|---|---|---|
| **Rhode Island** | R.I. Gen. Laws §17-4-8 | "immediately" | not specified | between April 1 and October 1 in any even numbered year. Governor may call the special election for the same day as general election |
| **South Carolina** | S.C. Code Ann. § 7-13-190 | no proclamation necessary; special election automatically held | approximately 126 days after vacancy | vacancy occurs 14 days after filing period closes and the office is uncontested |
| **South Dakota** | S.D. Codified Laws § 12-11-1 | 10 days | 80–90 days after vacancy | 180 days before general election |
| **Tennessee** | Tenn. Code Ann. § 2-16-101 | 10 days | 100–107 days | undetermined |
| **Texas** | Tex. Elec. Code Ann. §§ 201.051, 203.004, 204.021 | "as soon as practicable" | at least 36 days after proclamation | undetermined |
| **Utah** | Utah Code. Ann. § 20A-1-502 | not specified | not specified | undetermined |
| **Vermont** | Vt. Stat. Ann. 17 § 2621 | not specified | up to approximately 90 days from vacancy | within 180 days of the general election |
| **Virginia** | Va. Code Ann. §§ 24.2-209, 24.2-682 | "may immediately issue" | not specified | 55 days prior to primary election |
| **Washington** | Wash. Rev. Code § 29A.28.041 | 10 days | at least 140 days after proclamation | less than 240 days before general election |
| **West Virginia** | W. Va. Code § 3-10-4 | 5 days | 84–120 days after vacancy | 84 days prior to general election |

| Wisconsin | Wis. Stat. § 8.50 | not specified | not specified | between the second Tuesday in April and the second Tuesday in May or after August 1 in general election year |
|-----------|-------------------|---------------|---------------|---------------------------------------------------------|
| Wyoming | Wyo. Stat. Ann. § 22-18-105 | 5 days | 55 days after vacancy | within 180 days of general election |

### B.  Pertinent Case Law

Jurisprudence dating back to at least 1969 indicates that vacant congressional seats must be filled by an election.

#### 1.  *Valenti v. Rockefeller* (U.S. 1969)

In *Valenti v. Rockefeller*, the Supreme Court summarily affirmed a decision by a three-judge district court, sustaining the authority of the Governor of New York to fill a vacancy in the United States Senate by appointment until the next regularly scheduled senatorial election, where only sixty days remained until the next scheduled primary.  *Valenti v. Rockefeller*, 393 U.S. 405, 405 (1969).

Plaintiffs had argued that the operation of state law under the facts of the case infringed on the principle of popular election of senators and the "vacancy provision" of the Seventeenth Amendment to the United States Constitution.  *Valenti v. Rockefeller*, 292 F. Supp. 851, 853 (W.D.N.Y. 1968).  The district court held that the New York statutory provision at issue "d[id] not exceed the discretion conferred on the states by the Seventeenth Amendment with respect to the timing of vacancy elections and the procedures to be used in selecting candidates for such elections," and that "[s]ubstantial state interests [we]re furthered by the decisions of the New York Legislature that Senate vacancy elections be held only in conjunction with regular congressional elections."  *Id.* at 853–54.

26

### 2. *Jackson v. Ogilvie* (7th Cir. 1970)

The Court of Appeals for the Seventh Circuit held that plaintiffs, registered voters in an Illinois congressional district, stated a facially justiciable claim when they alleged that the Governor of Illinois, by refusing to call a special election to fill a vacancy that arose upon the death of plaintiffs' congressional representative, denied plaintiffs their constitutional right to representation under Article I, section 2, clause 4 of the United States Constitution. *Jackson v. Ogilvie*, 426 F. 2d 1333, 1335–36 (7th Cir. 1970).

The facts of the case are worth noting. The representative died on August 13, 1969. *Id.* at 1334. If the Governor had called the election the following day, state law mandated that the earliest possible date of election would be January 23, 1970 (162 days later). *Id.* at 1335, 3377. At most, the successor could have served some eleven months. *Id.* The court ruled that the Governor was required to issue the writ. *Id.* at 1337.

The court determined that a mandatory injunction would be appropriate because the governor "had the duty, *at the time of the death of [the congressman]*, to issue a writ of election to fill the vacancy," and that duty "continued, notwithstanding the fact that delay may eventually render the calling of a special election of so little use that the duty will no longer be enforceable." *Id.* at 1337 (emphasis added).

### 3. *Rodriguez v. Popular Democratic Party* (U.S. 1982)

Relying in part on *Valenti*, discussed *supra*, the Supreme Court upheld Puerto Rico statutes that had been interpreted to permit an interim vacancy in the Puerto Rico House of Representatives to be filled by the political party of the legislator who had vacated the seat. *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 14 (1982). The appointee could serve until the term of his predecessor expired. *Id.* at 3, n.2. The plaintiffs had argued that: (1) they

27

possessed a federal constitutional right to elect their representatives; and (2) legislative vacancies therefore must be filled by special election. *Id.* at 6.  The Court recognized that, when a state or the Commonwealth of Puerto Rico provides for election of state officials, all citizens within the relevant jurisdiction have an equal right to participate in the election. *Id.* at 2.  But the Court concluded that although Puerto Rico's "choice to fill legislative vacancies by appointment rather than by a full-scale special election may have some effect on the right of its citizens to elect the members of the Puerto Rico Legislature . . . the effect is minimal, and like that in *Valenti*, it does not fall disproportionately on any discrete group of voters, candidates, or political parties." *Id.* at 12.

### 4.  *Mason v. Casey* (E.D. Pa. 1991)

In *Mason v. Casey*, the district court dismissed claims by two registered voters challenging the constitutionality, as applied, of a state statute providing that a special election to fill a congressional vacancy could not be held until at least sixty days after issuance of the writ. *Mason v. Casey*, No. 91-5728, 1991 WL 185243, at *2 (E.D. Pa. Sept. 18, 1991).  The statute mandated that the writ must be issued within ten days of the vacancy. *Id.* at *1.

Application of this statutory time period meant that the special election to fill a vacancy in the plaintiff's district, which arose on September 11, 1991, could not be held until *after* the next general election on November 5, 1991. *Id.* at *2.  Plaintiffs claimed that the state's failure to hold the special election on the date of the general election would result in a deprivation of their fundamental right to vote and be represented. *Id.*  The court rejected the contentions, stating that although "it [wa]s undeniable that a delay [per the state statute] will mean a longer period of time in which voters from the Second Congressional District remain unrepresented . . .[;] the issue is whether the delay is unconstitutional, and I find that it is not." *Id.* at *2.

28

### 5. *American Civil Liberties Union v. Taft* (6th Cir. 2004)

On July 24, 2002, a Congressman was expelled from the Ohio House, leaving a vacant

seat. *Am. Civil Liberties Union v. Taft*, 385 F.3d 641, 644 (6th Cir. 2004).  The Governor of

Ohio, after consulting with local elected officials, decided not to call a special election,

ostensibly because of (1) the cost; (2) the difficulty presented by redistricting that was to take

effect for the regularly scheduled election in November 2002; (3) the relatively short length of

time an elected replacement could be expected to serve in light of Congress's scheduled

adjournment on October 3, 2002; and (4) and the uninterrupted continuation of constituent

services by the Clerk of the House. *Id.*  Five months remained before the next Congress would

convene.

The Court of Appeals for the Sixth Circuit held that the Governor violated the

Constitution when he refused to issue a writ. *Id.*  It noted there may be instances where the time

remaining in the congressional term is truly *de minimis*, thereby excusing the executive from

issuing the writ, but that the time involved in the instant case was not *de minimis*. *Id.* at 649.

The opinion stated:

> Like the Seventh Circuit [in *Ogilvie*], we conclude that Article I,
> section 2, clause 4 is mandatory, requiring the state's executive to
> issue a writ to fill a vacancy in the House. . . .  By deciding not to
> call a special election at all, *the Ohio governor had violated the
> Constitution, which imposes a mandatory duty on a state's chief
> executive to call a special election to fill a congressional vacancy.*

*Id.* at 649–50 (emphasis added).

### 6. *Judge v. Quinn* (7th Cir. 2010)

After then-Senator Barack Obama resigned from his Senate seat to assume the

presidency, the Governor of Illinois appointed Senator Burris to temporarily fill the vacancy.  He

did not issue a writ of election.  Illinois law required that the election must occur on November 2,

2010, two years later.

Plaintiffs sought a preliminary injunction, alleging that the Seventeenth Amendment required the Governor issue a writ of special election.  The Court of Appeals for the Seventh Circuit initially held that, although plaintiffs had a strong likelihood of establishing the merits of their claim, plaintiffs failed to show irreparable injury that would merit the grant of a preliminary injunction.  *Judge v. Quinn*, 624 F.3d 352, 355 (7th Cir. 2010) (summarizing previous holding).

Subsequently, the district court granted plaintiffs a permanent injunction; the Seventh Circuit upheld the ruling, stating "the balance of hardships favors the plaintiffs, who—along with the rest of the citizens of Illinois—will see their Seventeenth Amendment rights vindicated in a special election."  *Judge v. Quinn*, 624 F.3d 352, 362 (7th Cir. 2010).

### 7.  *Fox v. Paterson* (W.D.N.Y. 2010)

Both plaintiffs and defendant rely on this case.  The court held that a delay of some months in holding a special election to fill a vacancy in a legislative district—in order for the State to comply with the Help America Vote Act ("HAVA")—did not deny any fundamental rights of the electors within that district, including the right to vote and elect their congressional representative.  *Fox v. Paterson*, 715 F. Supp. 2d 431, 441–42 (W.D.N.Y. 2010).

The court based its decision in part on the governor's justifications for the delay: (1) serious concerns over the rollout of new electronic voting machines in several counties within the district in compliance with HAVA; and (2) the possible disenfranchisement of overseas military voters who would not be able to participate on too short a notice.  *Id.* at 440.  These explanations, the court reasoned, appeared to address legitimate concerns.  *Id.* at 441.  The court noted that, in some instances, the amount of time that passed from the existence of the vacancy to the issuance of the proclamation *could* amount to a *de facto* refusal to call a special election.

30

*Id.* at 442.

## VII.  Statutory Analysis

In *Fox*, the court properly interpreted the Governor's duty under the United States Constitution to issue a writ of election when presented with a vacant House seat.  *Id.* at 436.  But, it did not find it necessary to consider the interplay between the New York State Constitution and the section of the State's Public Officers Law that sets out specific provisions regarding the manner in which vacancies in elected office shall be filled, N.Y. Pub. Off. Law § 42(3) (McKinney 2011).

When both the State statute and State constitution are read in concert, the following is apparent:  Special elections in New York to fill vacant congressional seats must be conducted in "the shortest space of time reasonably possible."  *Roher v. Dinkins*, 32 N.Y.2d 180, 188 (1973) (citing *People ex rel. Weller v. Townsend*, 102 N.Y. 430 (1886); *Mitchell v. Boyle,* 219 N.Y. 242 (1916); *MacAdams v. Cohen*, 236 App. Div. 361 (1932), *aff'd* 260 N.Y. 559 (1932)); *cf. Skelos v. Paterson*, 13 N.Y.3d 141, 150 (2009) (same).

### A.  The United States Constitution

Article I of the United States Constitution provides in relevant part:

> **Section 2 – The House**
> . . .
> When vacancies happen in the Representation from any State, the Executive Authority thereof *shall issue Writs of Election* to fill such Vacancies.
> . . .
> **Section 4 – Elections, Meetings**
>
> *The Times, Places and Manner of holding Elections for* Senators and *Representatives, shall be prescribed in each State by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Place of Chusing Senators.
> . . .

31

U.S. Const. art. 1, §§ 2, 4 (emphasis added).

These clauses, read together, make it incumbent upon each "State" to issue a writ of election when faced with a vacant seat in the House of Representatives, and to "prescribe" the timing of such an election. *Id.*; *see also supra* Part IV.B.1 (discussing clauses); Part VI.B (expounding upon case law holding that, when a vacant seat occurs in the House of Representatives or the Senate, issuing a writ of election is not optional).

**B.  New York State Constitution**

The vacancy of elective office provision is contained in Article XIII, section 3, of the New York State Constitution.  It does not explicitly provide a time period within which a writ of election must issue after the vacancy of elected office occurs:

> The legislature shall provide for filling vacancies in office, and in case of elective officers, no person appointed to fill a vacancy shall hold his office by virtue of such appointment longer than the commencement of the political year next succeeding the first annual election after the happening of the vacancy.

N.Y. Const. art. XIII, § 3.

The New York Court of Appeals has read an urgency requirement into the above provision:  "It is axiomatic that under our State Constitution that when a vacancy in elective office occurs, the vacancy must be filled by election in *the shortest space of time* reasonably possible." *Roher v. Dinkins*, 32 N.Y.2d 180, 188 (1973) (emphasis added) (internal citations omitted); *cf. Skelos v. Paterson*, 13 N.Y.3d 141, 150 (2009) (emphasis added) (same); *Mitchell v. Boyle*, 219 N.Y. 242, 248 (1916) ("The vacancy . . . is to be filled by election, *as soon as may be, after it occurs*.  The Constitution, however, when it provides for an election, means an election of which adequate notice may be given to the voters. Any other election would be little better than a political mockery." (emphasis added)); *Wing v. Ryan*, 6 N.Y.S.2d 825, 829 (App.

32

Div.), *aff'd*, 278 N.Y. 710 (1938) ("It is a fundamental principle of our form of government that a vacancy in an elective office should be filled by election *as soon as practicable after the vacancy occurs*." (emphasis added)); *MacAdams v. Cohen*, 236 App. Div. 361, 363 (1932), *aff'd* 260 N.Y. 559 (1932) ("The policy of the State appears to be, from a long line of enactments, beginning with the first edition of the Revised Statutes of New York, that a vacancy in an elective office must be *promptly filled* by an election." (emphasis added and citation omitted)).

### C. New York State Public Officers Law Section 42(3)

#### 1. New York Court of Appeals Insists on Speedy Elections

Defendant argues that the ratification of New York State Public Officers Law abrogated New York Court of Appeals's precedents by imbuing the Governor with almost unlimited "discretion." Hr'g Tr. 21:21–22:2, Feb. 13, 2015. He contends: "*There is nothing in the Constitution or in any statute or in any case that requires*" the Governor to issue the writ of election within a specified period of time from the date an elected office was left vacant. *Id*. at 21:24–22:2 (emphasis added).

This view is too narrow. As plaintiff claims, the statute cannot be "read in a vacuum." Mem. of Law in Support of Pl.'s Order to Show Cause 12, ECF No. 4. The critical statutory provision, in relevant part, reads:

> [U]pon the occurrence of a vacancy in any elective office which cannot be filled by appointment for a period extending to or beyond the next general election at which a person may be elected thereto, *the governor may in his or her discretion make proclamation of a special election to fill such office, specifying the district or county in which the election is to be held, and the day thereof, which shall be not less than seventy nor more than eighty days from the date of the proclamation.*

N.Y. Pub. Off. Law § 42(3) (McKinney 2011) (emphasis added). After this provision was adopted, the New York Court of Appeals emphatically reaffirmed its prior holdings:

> *It is true that section 42 (subd. 3) of the Public Officers Law vests discretion in the Governor to call a special election, but as we observed in [1916] "this statutory qualification cannot prevail against the command of the Constitution that a vacancy shall be filled as soon as may be*."

*Roher v. Dinkins,* 32 N.Y.2d 180, 188 (1973) (emphasis added) (citing to 1916 case, *Mitchell*, 219 N.Y. at 248). *Cf.* N.Y. Op. Atty. Gen. (Inf.) 186, 1978 WL 27591 (the proper way to call attention to the failure of the Governor to issue a special election writ is to commence "a proceeding . . . to obtain a judgment to compel the vacancy [of the elected official] be filled by a special election"). N.Y. Op. Att'y Gen. (Inf.) 171,  1984 WL 186599 (citing *Roher* for the proposition that "[t]he purpose of [provisions including the State constitution and Public Officers Law 42(1)] is to ensure that when a vacancy occurs in an elective office, the vacancy will be filled in the shortest period of time reasonably possible"); 63C Am. Jur. 2d Public Officers and Employees § 146 (2015) (citing *Roher* to state that "[s]ome constitutional provisions limit to as short a term as possible the tenure of an appointee to a vacancy in an elective office.").

### 2.   The Statutory Seventy to Eighty Days Allows Ample Time to Prepare for a Special Election

The implication of the large seventy to eighty day period between announcement of the date for the special election and the actual date of the election provides ample time to prepare. *See* N.Y. Pub. Off. Law § 42(3) (McKinney 2011).  The spirit of the statutory scheme is clear: The announcement of the date for the election should occur almost immediately after the vacancy occurs.  *See Mitchell*, 219 N.Y. at 248 (explaining that thirty to forty days provides adequate notice to voters); *see also* N.Y. Pub. Off. Sec. 42 Bill Jacket (explaining that amendment to section 42(3) of the State's Public Officers law was intended "to provide county board of elections additional time prior to special elections in order to allow military ballots to be

timely mailed to voters" in compliance to federal law).

## VIII.   Instant Case

### A.  Standing

#### 1.  Law

The "irreducible constitutional minimum of standing contains three elements":  (1) "the plaintiff must have suffered an injury in fact," *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks, citations, alterations, and footnotes omitted).  A registered voter's allegation that a governor's failure to issue a writ of election and to fix a date for an election to fill a vacant congressional seat is sufficient injury in fact to be considered ripe and to confer Article III standing.  *See Judge v. Quinn*, 612 F.3d at 544–45.

#### 2.  Application of Law to Facts

Plaintiffs have standing.  *First*, they continue to suffer a concrete and particularized injury in fact: the deprivation of a special election for a vacant congressional district.  *See supra* Part III.B.  For a month, the citizens of New York's Eleventh Congressional District have had no voice in the House of Representatives.  *See supra* Part III.E.  *Second*, the injury is traceable to defendant:  The Governor is the only person who has the authority, pursuant to the New York State Constitution, to call for a special election for the position.  *See supra* Part VII.C.  *Third*, an injunction directing the Governor to call a special election forthwith will provide necessary redress for the serious injury to plaintiffs.  *See supra* Part VI.B (discussing relevant cases).  A

special election must take place as soon as possible.

### B. Ripeness

#### 1. Law

"To be justiciable, a cause of action must be ripe—it must present a real, substantial controversy, not a mere hypothetical question." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (internal quotation marks and citation omitted). To state a plaintiff's claim is constitutionally unripe is to state the claimed injury, if any, is not "actual or imminent," but instead "conjectural or hypothetical." *Id.* at 688; s*ee also N.Y. Civil Liberties Union v. Grandeau,* 528 F.3d 122, 130 n.8 (2d Cir. 2008) ("Standing and ripeness are closely related doctrines that overlap most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical." (internal quotation marks and alterations omitted)); *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 226 (2d Cir. 2008) (because the ripeness and standing doctrines "overlap," claims that were sufficiently "actual and imminent" to establish Article III standing also were ripe for adjudication, "not merely speculative or hypothetical").

#### 2. Application of Law to Facts

The case is ripe for adjudication. Plaintiffs' injury is real and substantial: They do not have representation in the House of Representatives. Nothing is "speculative" or "hypothetical" about this disenfranchisement.

## C. Injunctive Relief

### 1. Preliminary Injunction

#### a. Law

Federal Rule of Civil Procedure 65 provides procedures to adjudicate requests for

injunctions.  Where speed is needed, a preliminary injunction may be sought.  Subdivision (a) of

Rule 65 reads:

> (1) *Notice.*  The court may issue a preliminary injunction only on
> notice to the adverse party.
>
> (2) *Consolidating the Hearing with the Trial on the Merits.*
> Before or after beginning the hearing on a motion for a
> preliminary injunction, the court may advance the trial on the
> merits and consolidate it with the hearing.  Even when
> consolidation is not ordered, evidence that is received on the
> motion and that would be admissible at trial becomes part of
> the trial record and need not be repeated at trial.  But the
> court must preserve any party's right to a jury trial.

The Court of Appeals for the Second Circuit has explained:

> Generally, a party seeking a preliminary injunction must establish
> (1) irreparable harm and (2) either (a) a likelihood of success on
> the merits, or (b) sufficiently serious questions going to the merits
> of its claims to make them fair ground for litigation, plus a balance
> of the hardships tipping decidedly in favor of the moving party.
> Additionally, the moving party must show that a preliminary
> injunction is in the public interest.

*Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011) (internal quotation

marks and citations omitted).

The "'fair ground for litigation'" cannot be used to challenge "'governmental action

taken in the public interest pursuant to a statutory or regulatory scheme.'"  *Monserrate v. New*

*York State Senate*, 599 F.3d 148, 154 (2d Cir. 2010) (quoting *Plaza Health Labs., Inc. v. Perales*,

878 F.2d 577, 580 (2d Cir.1989)).  In such cases, the moving party must establish a likelihood of

success on the merits, *id.*, a "more rigorous" standard. *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (internal quotation marks and citation omitted).

### i.   Irreparable Harm

In every case where plaintiff seeks an injunction, she must show that there is no adequate remedy at law *and* that irreparable harm will result if the injunction is not granted. This showing is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citations omitted). Irreparable harm may not be premised "only on a possibility." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Rather, the movant must demonstrate injury that is neither remote nor speculative, but actual and imminent, and that cannot be remedied by award of monetary damages. *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995).

### ii.   Clear or Substantial Likelihood of Success on the Merits

Where the requested injunction is *mandatory* in nature—in other words, where the movant seeks to compel, rather than prohibit, governmental action, a "district court may enter a mandatory preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a 'clear' or 'substantial' likelihood of success on the merits." *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 89 (2d Cir.2006) (emphasis omitted) (citing *No Spray Coalition, Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001)); *Monserrate*, 695 F. Supp. 2d 80 at 89 (S.D.N.Y.), *aff'd*, 599 F.3d 148 (2d Cir. 2010).

### iii.  Balance of Hardships

"[A] court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of*

*Gambell, AK*, 480 U.S. 531, 542 (1987).

### iv.  Public Interest

Ensuring "that the public interest would not be disserved by the issuance of a preliminary injunction" requires careful assessment.  *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  The focus is the effect of the injunction itself on the public interest apart and separate from the particularized concerns of the parties.  *S.E.C. v. Citigroup Global Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012) (interpreting *Salinger*, 607 F.3d at 68).

### b.  Application of Preliminary Injunction Law to Facts

Here, plaintiffs seek an immediate "Writ of Mandamus" to compel defendant to issue a "Writ of Election" to fill the congressional vacancy in the Eleventh Congressional District.  Pl. Mem. Law 5.  In modern terminology, this is a request for a mandatory preliminary and a mandatory permanent injunction pursuant to Federal Rule of Civil Procedure 65.

At the evidentiary hearing, based upon the sketchy information supplied by both sides, the court was not prepared to issue or to deny a preliminary injunction.  *See generally* H'rg Tr., Feb. 13, 2015.

Nevertheless, review of the evidence, the precedents, and relevant statutory provisions, it is determined that plaintiffs have made a *prima facie* case for a preliminary injunction.

*First*, plaintiffs demonstrate irreparable harm since money damages cannot make them whole.  *See supra* Part III.  They have lost their ability to participate not only in the making of the nation's policies at large, but in those that affect their daily lives.  *See supra* Parts II & III. They are bereft of an advocate to help them navigate the morass of government bureaucracy. *See supra* Part II.

39

*Second*, they make a substantial case for a preliminary injunction.  *See* Part VII (expounding on requirement under federal and New York State law to issue writ as soon as practicable).

*Third*, hardship to plaintiff is great and continuing.  S*ee* Part III.E.  By contrast, defendant has advanced no justification for his failure to issue the writ of special election, much less any hardship preventing him from so doing, or that would result if he did.  *See supra* Part III.C.

*Fourth*, filling the vacancy would benefit, not threaten, the greater public interest.  *See supra* Part II.  Aside from the cost of the special election, the court is not aware of, and defendant has not yet proffered, any reason that the injunction sought would constitute a threat to the public interest or an undue burden.  *See supra* Part III.

### 2.  Permanent Injunction

#### a.  Law

The court may advance the trial on the merits for a permanent injunction to consolidate it with the hearing on the preliminary injunction.  *See* Fed. R. Civ. Pr. 65(a)(2) (consolidating hearing on preliminary injunction with trial on the merits).

Consolidation may occur "only after the parties receive clear and unambiguous notice of the court's intent to do so either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases."  *Woe by Woe v. Cuomo*, 801 F.2d 627, 629 (2d Cir. 1986) (internal quotation marks and citation omitted).  "The giving of formal notice ensures both that a party may avail himself of every opportunity to present evidence pertinent to his position and that all genuine issues of fact are before the court."  *Id.*  But "[a] party cannot lay back, acquiesce in the merger of a preliminary hearing with a permanent one, and then protest the procedure for the first time after the case is decided adversely to it."  *K-Mart*

40

*Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989).

"The equitable principles and scope of review" for preliminary relief and permanent injunction remain the same.  *Sierra Club v. Hennessy*, 695 F.2d 643, 647 (2d Cir. 1982). "Although a showing of 'irreparable harm' is required for the imposition of any injunctive relief, preliminary or permanent,  the 'imminent' aspect of the harm is not crucial to granting a permanent injunction."  *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235, n.9 (2d Cir. 1999) (per curiam) (internal citation omitted).

"To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted."  *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) (internal quotation marks and citation omitted).

### b.  Application of Permanent Injunction Law to Facts

The need for speed in the present case warrants consolidation.  This opinion constitutes notice to defendant.  There has been ample time to prepare for a hearing.

Plaintiff has demonstrated no adequate remedy at law and irreparable harm if relief is not granted.  *See supra* Part VIII.C.a–b.

As a practical matter, the effect of a preliminary injunction and a permanent injunction would be the same: defendant would be compelled to fix a date for an election.

## IX.   Additional Claims

Plaintiffs' claims pursuant to section 1983 of Title 42 of the United States Code, the Fourteenth Amendment, and the First Amendment need not be addressed.  They are, in effect, dealt with in the instant decision.

## X.    Conclusion

A hearing on the petition for a permanent injunction ordering the Governor of the State of New York to fix the date for a special election to choose the Representative of the Eleventh Congressional District of New York to the House of Representatives will be held on February 20, 2015 at 12:00 noon in Courtroom 10B South.  Unless the Governor of the State of New York has set a date for the special election on or before that time or justifies a further delay, this court will set the date.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated:  February 16, 2015
          Brooklyn, New York

42